IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ANGIE RENEE HORNE, ) | |
| ) | |
| Petitioner, ) | |
| ) | 1:19CV196 |
| v. ) | 1:17CR288-2 |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Angie Renee Horne, a federal prisoner, has brought a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Docket Entry 63.) Petitioner and her husband were on pretrial release awaiting sentencing in Middle District of North Carolina Case No. 1:16CR304, charged with acquiring a controlled substance by fraud, when they were charged in this case, Case No. 1:17CR288.[1] (Docket Entry 42 at ¶¶ 5-19.) Petitioner later pled guilty in November of 2017, in this case, pursuant to a plea agreement, to conspiracy to distribute methamphetamine and distributing methamphetamine and was sentenced in February of 2018 to 160 months of imprisonment, to run consecutively to the eighteen-month undischarged term of imprisonment she was serving in Case No. 1:16CR304-2. (Docket Entries 1, 25-26, 47; Minute Entries 11/6/2017 and 2/21/2018; Case No. 1:16CR304-2, Docket Entry 57.) Judgment was entered on March 6, 2018. (Docket Entry 47.) Petitioner did not file an appeal. Instead, in late March of 2018, she filed a "Pro

---

[1] Unless otherwise noted, all citations to the record are to Case No. 1:17CR288-2.

Se Motion for Modification of Sentence Pursuant to § 18 U.S.C. 3582(c)(2)," which the Court construed as a motion made pursuant to 28 U.S.C. § 2255, and which it dismissed without prejudice in late September of 2018. (Docket Entries 55, 56, and 61.)

Petitioner filed the instant motion in February of 2019. (Docket Entry 63.) The Government filed a response (Docket Entry 71) and Petitioner, in turn, filed a reply (Docket Entry 75). The undersigned then recommended that all of Petitioner's grounds and sub-grounds for relief be denied, save one sub-ground (discussed below), which required an evidentiary hearing. (Docket Entry 77.) The Court subsequently held that evidentiary hearing. (Docket Entries 86 and 87.) The matter is now before the Court for a ruling. *See* Rule 8, Rules Governing Section 2255 Proceedings.

## PETITIONER'S GROUND

Petitioner's remaining sub-ground for relief alleges ineffective assistance of counsel because "after the sentencing, [counsel] did not communicate with Horne about an appeal [and] did not file one after Horne asked him to." (Docket Entry 64 at 32.) As explained in greater detail below, the undersigned finds this argument persuasive and recommends that Petitioner prevail on this sub-ground only.

## DISCUSSION

In order to prove ineffective assistance of counsel, a petitioner must establish, first, that her attorney's performance fell below a reasonable standard for defense attorneys and, second, that she was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668, 688, 691-92 (1984). A petitioner bears the burden of affirmatively showing deficient

2

performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). The Supreme Court has also held that the dual performance and prejudice inquiry of *Strickland* provides the proper framework for analyzing a claim that counsel was ineffective for failing to file a notice of appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000). A defense attorney's performance falls below an objectively reasonable standard, and is *per se* ineffective assistance of counsel, if he disregards the defendant's "specific instructions" to file a notice of appeal which defendant wants at the time and to which the defendant has a right. *Id.* at 477. Nevertheless, if a defendant neither instructs counsel to file an appeal, nor asks that an appeal not be taken, and if counsel consulted with the defendant about an appeal, counsel performs unreasonably only by failing to follow the defendant's express instructions with respect to an appeal. *See id.* at 478.

An attorney "has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Roe*, 528 U.S. at 480; *see also id.* at 477 (stating that "courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct and judicial scrutiny of counsel's performance must be highly deferential") (internal brackets, citation, and quotation marks omitted). Additionally, "to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an

3

appeal, he would have timely appealed." *Id.* at 484. The term "consult" in this context means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* at 478.

Moreover, "in assessing the credibility of witnesses, trial courts consider 'variations in demeanor and tone of voice.'" *Rahman v. United States*, No. 7:08-CR-126-D, 2013 WL 5222160, at *5 (E.D.N.C. Aug. 27, 2013) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)). "In addition, '[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Id.* (citing *United States v. Marcavage*, 609 F.3d 264, 281 (3d Cir. 2010)). "Additional considerations can include the witness's motive to lie and the level of detail in the witness's statements." *Id.* (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

### Evidentiary Hearing

    **i.    Petitioner's Testimony**

Petitioner, represented by newly appointed counsel Brian Aus, testified under penalty of perjury at the evidentiary hearing.[2] (Docket Entry 87 at 1-2.) During direct-examination, Petitioner testified that she was currently serving a 160-month sentence in federal prison for conspiracy to distribute methamphetamine and distribution of methamphetamine. (*Id.* at 4-5.) She testified that her attorney in this criminal case was Corey Buggs, that she entered a plea of guilty, and that she was sentenced before Judge Osteen in 2018. (*Id.* at 5-6.)

---

[2] Both Petitioner and prior counsel testified remotely by way of video conference, while Petitioner's mother testified in the courtroom. (Docket Entry 86.)

4

Petitioner explained that Judge Osteen informed her of her appellate rights, including her right to appeal, during the sentencing hearing. (*Id.* at 6.) Petitioner testified that immediately after sentencing, when she was getting ready to walk out of the courtroom, she asked Mr. Buggs to appeal on her behalf. (*Id.* at 6-7.) Petitioner testified further that in response, Mr. Buggs "nodded his head" but he did not say anything. (*Id.* at 7.) She took this to mean that Mr. Buggs "was going to appeal it." (*Id.*)

Petitioner further stated that she received a copy of the judgment, and that she did not believe that it came from Mr. Buggs, but that it instead came from the Magistrate Judge, who sent it to her after she filled out a motion for a reduction of her sentence in August of 2018. (*Id.* at 8.) Petitioner then testified about her efforts to contact Mr. Buggs between her sentencing in February and August of 2018. (*Id.* at 8-9.) She stated that "I don't know the exact date, but I do know once I got to Oklahoma that I had to try -- I tried to call him several times, and I didn't never get through. I couldn't leave a message because my call wasn't accepted. And then when I got to Hazelton, I tried to call him for at least three or four weeks and never got a return call – or never got answered." (*Id.* at 8-9.) Petitioner testified that this was because she could not leave a voice mail because "someone has to accept the call in order for you to leave a message." (*Id.*) Petitioner testified that she only received the judgment in her criminal case some time after August of 2018 after she filled out her first motion for a reduction of sentence and she stated further that she still wished to proceed with an appeal. (*Id.*) Petitioner also testified that she had spoken to her mother—Sherrie Morton—about trying to contact Mr. Buggs. (*Id.* at 10.)

5

On cross-examination, Petitioner reiterated that she asked her attorney to appeal her case immediately after being sentenced and as she was getting ready to leave the counsel table to walk out of the courtroom. (*Id.* at 10-11.) Petitioner again stated that in response, Mr. Buggs "nodded his head" but did not say anything to her. (*Id.* at 11.) She testified that after this, she was taken to a holding cell but did not ask to speak with Mr. Buggs there. (*Id.*) Petitioner stated that after she was sentenced, she was kept in Greensboro "a couple hours" and that during that time she did not ask to speak to Mr. Buggs. (*Id.* at 11-12.) Petitioner next stated that she did not ask to speak with Mr. Buggs after she got to Orange County and that she did not recall whether she tried calling him from Orange County. (*Id.* at 11-12.) Petitioner stated further that "the very next day" she was shipped to Farmville, Virginia and that she was "probably" there "around two to three weeks" and then she was shipped to Oklahoma. (*Id.* at 12.) She did not recall if she attempted to phone from Farmville. (*Id.*)

Petitioner next testified that she heard Judge Osteen tell her that she had fourteen days to appeal and she testified further that those fourteen days expired while she was in Farmville. (*Id.*) When asked what she did to convey her intent to appeal, Petitioner testified that "Well, I didn't do anything in Farmville. I didn't start trying to call him until I got to Oklahoma because I figured he was appealing my case since he nodded his head." (*Id.* at 15.) Petitioner admitted that other than telling Mr. Buggs to appeal while she was in the courtroom, she did not do anything else to convey her intent to appeal her case. (*Id.* at 13.)

Petitioner testified further that when she got to Oklahoma at the end of March, she asked her mother by telephone (but not in writing) to call her attorney "and let him know to

6

appeal [her] case and see if he did anything." (*Id.* at 13-14.) When asked if she could have written Mr. Buggs, Petitioner stated that she did not have her personal property or anything yet at that point, meaning that she did not have paper or pen. (*Id.* at 14.) Petitioner, however, admitted further that she did not ask anyone at the Bureau of Prisons for those things. (*Id.*) Petitioner reiterated that other than speaking with her mother, all she did beyond this was call her attorney, who never answered her. (*Id.*) Petitioner explained that she called Mr. Buggs by telephone; however, she could not leave a message because no one accepted her call. (*Id.* at 14-15.) Petitioner admitted that she did not convey her intent to appeal in her motion for a reduction of sentence and instead only did so after she got some assistance with her § 2255 motion. (*Id.* at 15-16.)

On redirect, Petitioner testified that she never got a copy of the judgment from her attorney and that she never knew when her time to appeal started to run. (*Id.* at 16.) She testified further that she contacted her mother and asked her to contact Mr. Buggs. (*Id.*) Petitioner stated further that she "understood there was an appeal being entered on [her] behalf before [she] filed the paperwork." (*Id.*)

On re-cross, Petitioner admitted that while she believed that an appeal had been filed, she had received no paperwork or anything similar giving her notice that an appeal had been filed. (*Id.* at 17.) She admitted further that, other than have her mother call her attorney, she had not done anything else to ensure that her appeal had been filed. (*Id.*) On further redirect examination, Petitioner testified that it was "maybe six months" between her sentencing and

7

when she filed her first paperwork with the Court and she testified further that the judgment was filed in March. (*Id.* at 17-18.)

### ii. Sherrie Jean Morton's Testimony

Petitioner's mother—Sherrie Jean Morton—testified next, stating that she was present at her daughter's sentencing in this matter and that she heard Judge Osteen advise Petitioner about her appeal rights. (*Id.* at 18-19.) Petitioner's mother admitted that she did not hear whether Petitioner said anything to Mr. Buggs. (*Id.* at 19.) Ms. Morton testified that at some point after sentencing, she spoke with Petitioner about an appeal. (*Id.*) Ms. Morton testified that Petitioner "wanted me to contact Mr. Buggs to see if he had filed an appeal and to see what the process was with that. So I tried to call up there several times, and each time I called I would get a recording. I would leave a message explaining who I am and, you know, what I was calling for, and I'd leave my number for him -- somebody to return my call, and nobody would ever return the call." (*Id.* at 19-20.)

Ms. Morton testified that she attempted to call Mr. Buggs "probably" "four or five times" and that she did so at some point after sentencing. (*Id.* at 20.) Ms. Morton testified that Petitioner would "call [her] all the time to see if I had got in contact with him; and I told her, you know, I called and, of course, nobody ever returns the call. So, you know, at that point I didn't know what to do." (*Id.* at 20.) Ms. Morton testified that Petitioner had called her from "probably every place she had been" and asked if she had called Mr. Buggs. (*Id.*) Ms. Morton testified that "[s]ometimes I even told [Petitioner] that I did because I got tired of calling and not getting no response." (*Id.*)

8

Ms. Morton testified that "probably three to four months after – after her sentencing" Petitioner told her that she filed some papers with the Court, but she (Ms. Morton) did not what they were or whether there was something else Petitioner should have filed. (*Id.* at 20-21.) Ms. Morton stated that she did not remember the exact date, but that at some point she hired an attorney to prepare some paperwork for her daughter. (*Id.* at 21.) Ms. Morton stated further that she "had not heard back from Mr. Buggs during this whole time period." (*Id.*)

On cross-examination, Ms. Morton reiterated that she could not hear what Petitioner would say to Mr. Buggs at the counsel table in the courtroom and that she tried to call Mr. Buggs no more than four to five times. (*Id.* at 21-22.) She stated that every time she called she got a recording, with a female on it, asking her to leave her name, number, and a brief message and that somebody would contact her back. (*Id.* at 22.) Ms. Morton stated that she lived in Albemarle, North Carolina and that she thought Mr. Buggs' office was around Greensboro, but that she had never been to his office. (*Id.* at 22.) Ms. Morton stated that she did not have Mr. Buggs' address. (*Id.*) She stated further that she believed that an appeal was important, but that she assumed that after Petitioner told Mr. Buggs to file one, he would file one, because he was Petitioner's attorney. (*Id.*) Ms. Morton admitted that she did not attempt to locate Mr. Buggs' office, only left him four to five messages, and did not attempt to tell him in person. (*Id.* at 22-23.) She stated that she did not know where Mr. Buggs' office was and assumed it was around Greensboro. (*Id.* at 23.) Ms. Morton stated that she did not drive out of town "like that" and instead has someone else drive her. (*Id.*) In support, Ms. Morton

9

stated that someone had driven her to the hearing that day. (*Id.*) Ms. Morton admitted that she did not do anything to tell the Court directly that Petitioner wanted to appeal and said that this was because she "figure[d] the courts would [not] hear anything from [her] being [that she] wasn't the defendant." (*Id.*) Ms. Morton stated that she had no records of her phone calls to Mr. Buggs' office and that all she had was her word that she left four or five phone messages. (*Id.*)

### iii. Corey Buggs

Petitioner's former counsel, Corey Buggs, testified next. He stated that he was the attorney of record for Petitioner and that he was in court at the time Judge Osteen notified Petitioner of her right of appeal. (*Id.* at 24.) Mr. Buggs stated that he had "no recollection" of "whether or not [Petitioner] told [him] after she was sentenced that she wished to enter a notice of appeal[.]" (*Id.*) Mr. Buggs stated further that he had "no recollection" of Petitioner "asking anything at all about her sentence after the conclusion of the hearing[.]" (*Id.*) Mr. Buggs also stated that he reviewed his case file in advance of the hearing and that there were no notations in his case file regarding whether or not Petitioner indicated she wanted to appeal her sentence. (*Id.* at 25.)

Mr. Buggs testified that he received a copy of the judgment in this case and it had been filed on March 6, 2018. (*Id.*) He was asked if he sent a copy of it to Petitioner and he stated, "Not to my recollection. I specifically don't recall." (*Id.* at 25-26.) Mr. Buggs testified that, once he gets a judgment in a case, he "typically" tries to locate his client. (*Id.* at 26.) However, in this particular case, Mr. Buggs did not "specifically" remember. (*Id.*) Mr. Buggs

10

testified that he did not "believe" that there was anything in his case file showing that he had transmitted the judgment to Petitioner. (*Id.*) He admitted that it was "a fair statement" that he "probably did not send a copy" of the judgment to Petitioner (*Id.*) Mr. Buggs testified further that he did not "specifically remember sending [Petitioner] a letter [containing a copy of the judgment] but it's typically [his] practice." (*Id.* at 27.) He stated that he did not see a transmittal letter to Petitioner after reviewing his file. (*Id.*)

Mr. Buggs stated that he recalled seeing Ms. Morton "during the course of the pending of the case" but that he did not remember if she was in Judge Osteen's courtroom during Petitioner's sentencing. (*Id.*) Mr. Buggs stated that he thought that he spoke with Ms. Morton "briefly on the telephone sometime during the pendency of the case" but that this was prior to sentencing. (*Id.* at 28.) Mr. Buggs testified that he was not aware of any voice mails left at his office from Ms. Morton. (*Id.*) Mr. Buggs testified that he has two full-time secretaries and that, if any voice mails are left after closing time, the secretaries typically leave written messages on his desk saying that he had a message from a particular person. (*Id.*) Mr. Buggs did not recall there being anything in his message books showing that Ms. Morton had tried to contact him. (*Id.*) He testified that no one checks voice mails during office hours because the office is manned from about 8:15 a.m. until about 5:30 p.m. and after that time the calls go to voice mail. (*Id.* at 28-29.)

On cross-examination, Mr. Buggs testified that prior to sentencing typically he would go over the presentence report with a defendant and let them know they had the right to appeal and that the court would also go over their appeal rights at the sentencing. (*Id.* at 29.)

11

Mr. Buggs did not have a specific recollection that he did that in this case, but said that it was typically his practice and that he had been in federal criminal practice in total in excess of twenty years. (*Id.* at 29-30.) He then stated that while he had no specific recollection here, it has been his practice during that time to advise about the appeal rights prior to sentencing. (*Id.* at 30.) Mr. Buggs stated that he had no recollection of being told by Petitioner that she wished to appeal. (*Id.*)

Mr. Buggs testified that if someone told him they wished to appeal immediately after sentencing in the courtroom, he would have told them that it is not proper to file an appeal until after the filing of the judgment; but in some cases, if they really insist, he would go ahead and file it. (*Id.* at 30.) Mr. Buggs stated that after sentencing he would go to the holding cell to see a defendant only upon their request and stated further that he did not receive any request like this from Petitioner. (*Id.* at 31.) Mr. Buggs said that he had no recollection of receiving a phone message from Petitioner, that he had two full time secretaries, and that there is no voice mail between 8:15a.m. until 5:30 p.m. Monday through Friday. (*Id.*) Mr. Buggs testified that it was highly unlikely that during that time someone could have left a voicemail "because typically if one secretary has to step out or needs to take a break, the other secretary is there. So they -- they cover each other." (*Id.*)

Mr. Buggs testified that when someone does leave a voice mail, typically a secretary will check the machine and leave him a written message on his desk that a certain person called at a particular time and what the nature of their call was. (*Id.* at 31-32.) He stated that after Petitioner was sentenced, he was not aware of receiving any written message about any

12

voice mail related to her case. (*Id.* at 32.) Mr. Buggs testified that his office is located in Lexington, North Carolina and had been there for fifteen years or more. (*Id.*) He testified that he never met with Petitioner at his office because she was always in custody when he met with her. (*Id.*) Mr. Buggs stated that he thought he assumed her case from a different attorney and that when he did so it was after she had been arrested while on release from a prior criminal charge. (*Id.*) He testified that at no time did he receive any notice from Petitioner that she intended to appeal her case. (*Id.*)

Mr. Buggs testified that after a defendant he has represented has been sentenced federally, his practice was to try to locate that person, but it was sometimes difficult because they are moved around by the marshals, but that, in any event, he typically tries to locate that person and send them a disposition letter. (*Id.* at 33.) Mr. Buggs stated that he did not specifically recall doing that in this case, but that when he reviewed his file, he did not see a specific letter to Petitioner. (*Id.*) He stated further that after reviewing his file, he found some notation, "but that was prior to the sentencing. I just noted in my file that we discussed her rights to appeal." (*Id.*) Mr. Buggs stated that the time in which to appeal would have been part of any discussion that he had with Petitioner. (*Id.*) Mr. Buggs also stated that he was present when the judge informed Petitioner of her right to file an appeal. (*Id.*)

On redirect, Mr. Buggs testified that he had no recollection "one way or the other" if Petitioner told him to appeal in the courtroom after sentencing. (*Id.* at 34.) He stated that typically his office would accept prepaid calls from jail or prison. (*Id.*) Mr. Buggs testified that he thought that typically whether a call is prepaid (as opposed to collect) is announced

13

at the time the call is received. (*Id.* at 34.) He stated that he is not the one who would answer such calls, but that his staff would do so. (*Id.*) Mr. Buggs again admitted that even though it was his standard practice to send a letter with the judgment to a client, if he could locate that client, he could not find such a transmission letter to Petitioner in this case. (*Id.* at 35.)

On re-cross Mr. Buggs testified that in his more than ten years of federal practice, there had never been a situation in which a defendant/client had indicated to him that she wished to appeal and he failed to give notice of appeal. (*Id.*) Mr. Buggs said that this would be his first such occasion. (*Id.*)

The undersigned then briefly questioned Mr. Buggs. (*Id.* at 36.) Mr. Buggs testified that it was his typical practice to consult with clients about the strengths and weaknesses of a potential appeal. (*Id.* at 36.) When asked if he did that in this case, Mr. Buggs testified, "To my recollection, I would say, yes, I did. Again, that's my typical practice." (*Id.*) Mr. Buggs then testified that he did not have a specific recollection as to whether he informed Petitioner about the merits of an appeal. (*Id.*) He testified that "I do recall that she and I had a conversation prior to sentencing that she was probably going to receive a lengthy sentence because these crimes occurred while she was actually on release from another crime." (*Id.* at 37.) Mr. Buggs was then asked if he had a specific recollection of telling Petitioner about the strengths and weaknesses of an appeal after she was sentenced and he said, "[N]o. I don't recall speaking with her after sentencing." (*Id.* at 38.)

Mr. Bugs also testified that prior to sentencing he did discuss the strength of the evidence against Pettinger in her case. (*Id.*) Mr. Buggs stated that this evidence included acts

14

that were video recorded and stated further that he and Petitioner looked at those video recordings while she was in the Orange County jail. (*Id.*) Mr. Buggs reiterated that it was his practice to counsel clients about the merits of a potential appeal, but that he did not recall speaking to Petitioner here about the merits of an appeal. (*Id.* at 38.) Mr. Buggs stated that "[t]he only recollection that I have would be that she and I would have discussed her right to give notice of appeal." (*Id.* at 39.)

## The Court's Findings of Fact and Conclusions of Law

The undersigned concludes that Petitioner has carried her burden as to this sub-ground. The undersigned finds that counsel failed to file a notice of appeal after Petitioner clearly instructed counsel to do so immediately after her sentencing hearing and that Petitioner was prejudiced as a result because she lost her opportunity to appeal.[3] The undersigned finds further that Petitioner reasonably demonstrated to counsel that she was interested in appealing when she asked him to appeal on her behalf immediately after sentencing. This triggered counsel's obligation to advise Petitioner about the advantages and disadvantages of taking an appeal and to determine Petitioner's wishes in this regard. Counsel failed to discharge that duty. Petitioner was prejudiced as a result because there is a

---

[3] The fourteen-day deadline for a criminal defendant to file a notice of appeal generally runs from the entry of judgment. Fed. R. App. P. 4(b)(1)(A)(i). Nevertheless, "[a] notice of appeal filed after the court announces a . . . sentence . . . but before the entry of the judgment or order--is treated as filed on the date of and after the entry." Fed. R. App. P. 4(b)(2).

15

reasonable probability that,[4] but for counsel's deficient failure to consult with Petitioner about an appeal and discern her wishes, she would have timely appealed.

Petitioner testified credibly in support of these findings and the Court reaches this conclusion in light of her tone, demeanor, and body language, which the undersigned witnessed at the evidentiary hearing in this matter. Moreover, Petitioner generally had good recall of the events in question, to the extent they can be corroborated on the record. For example, Petitioner accurately recalled her relevant charges, guilty plea, conviction, sentence, sentencing hearing, and the name of her sentencing judge and attorney. (Docket Entry 87 at 4-6.) She also accurately recalled that the sentencing judge informed her of her appellate right at the end of her sentencing hearing. (*Id.* at 6 referencing Docket Entry 70 at 32. ("If you choose to appeal, notice of appeal must be filed within 14 days of the entry of judgment.").) Petitioner also accurately recalled that she filed a motion to reduce her sentence in August of 2018.[5] (Docket Entry 87 at 8 referencing Docket Entry 55.) All this

---

[4] In reaching the conclusion that, but for counsel's errors, there is a reasonable probability that Petitioner would have appealed, the undersigned relies upon Petitioner's credible testimony that she told counsel in a timely manner to file a notice of appeal, that she made efforts to contact him by phone later regarding that appeal, and that she still wishes to appeal today. (Docket Entry 87 at 6-9.) Although Mr. Buggs testified that his office would accept phone calls, he only mentioned accepting prepaid calls. (*Id.* at 34.) This is consistent with Petitioner's testimony that she was unable to leave a message at Mr. Buggs' office because someone had to first accept the call. (*Id.* at 8-9.)

[5] At the end of the evidentiary hearing described above, the Government observed that "the very first statement we have from [Petitioner] in writing, that motion for a sentence reduction, doesn't mention an intent to appeal her sentence. In fact, nothing does until an attorney was hired and the 2255 was written. That's the first documented evidence of an intent to appeal." (Docket Entry 87 at 41.) However, this does not damage Petitioner's credibility. Sentencing in this case was in February of 2018 (2/21/18 Minute Entry), judgment was entered on March 6, 2018 (Docket Entry 47), and the motion requesting a reduction of sentence was filed in late August of 2018 (Docket Entry 55). Petitioner testified persuasively that when she filed her motion for a sentence reduction, which was roughly six months after sentencing, she was under the impression that

supports the conclusion that Petitioner also accurately recalled that she instructed counsel—soon after a sentencing hearing in which she received a 160-month sentence and just after she was informed by Judge Osteen that she had a right to appeal—to file a notice of appeal on her behalf and that counsel nodded in agreement that he would do so. However, counsel never filed a notice of appeal on Petitioner's behalf. Nor does it appear that he ever communicated with Petitioner after sentencing about the advantages and disadvantages of taking an appeal or attempt to discern her wishes in this regard.

Mr. Buggs, on the other hand, is not a particularly helpful witness in the search for truth on this sub-ground. This is because he remembered very little about this case. Mr. Buggs did not remember one way or another whether Petitioner told him to appeal in the courtroom after sentencing. (Docket Entry 87 at 24, 34.) Nor did he remember whether or not he ever sent Petitioner a copy of her criminal judgment or a letter referencing that judgment's disposition. (*Id.* at 26-27, 35.) In fact, Mr. Buggs admitted that it was "a fair statement" that he "probably did not send a copy" of the judgment to Petitioner. (*Id.* at 26.) Without this knowledge, Petition would not have known when her fourteen-day period to file a notice of appeal began and when it ended. Nor did Mr. Buggs recall whether he received a phone message from Petitioner or whether he informed Petitioner about the merits of an appeal. (*Id.* at 31, 37.)

---

counsel had filed an appeal on her behalf and that her appeal was already under way. (Docket Entry 87 at 16.) In light of the timing of events just discussed, and in light of this Court's finding that counsel was instructed to file an appeal immediately after sentencing, this was not an unreasonable assumption and the Court does not find that it warrants a negative credibility inference.

17

Instead, Mr. Buggs testified as to his typical practice. For example, he testified that he typically tries to locate what facility his clients are being held in after sentencing, though he could not recall if he did that for Petitioner. (*Id.* at 33.) Mr. Buggs also testified that he typically sends clients a disposition/transmittal letter after sentencing containing or referencing the final judgment in their criminal case, thought he does not recall whether he did so here and, in fact, admits that he probably did not. (*Id.* at 26-27, 33.) He further testified that it was his typical practice to consult with clients about the strength and weakness of a potential appeal, but he does not recall if he did that here. (*Id.* at 36-37.)

Importantly, Mr. Buggs admitted that this was not a typical case. Specifically, he admitted that he probably did not send Petitioner a disposition letter regarding her criminal judgment, as was his typical practice. (*Id.* at 26-27, 33.) Coupled with Petitioner's testimony in this matter, as well as with Mr. Bugg's poor recollection of events, the undersigned is unwilling to presume that Mr. Buggs followed his other typical practices here, including consulting with his client about the advantages and disadvantages of filing an appeal and filing an appeal when asked in a timely manner to do so. Thus, in light of the foregoing, the undersigned recommends that the judgment in this case be vacated and re-entered so that Petitioner may pursue a direct appeal in the Fourth Circuit.[6]

**IT IS THEREFORE RECOMMENDED** that Petitioner's motion (Docket Entry 63) be **GRANTED** in part and **DENIED** in part. Specifically, to the extent that Petitioner seeks the

---

[6] Because the Court was able to reach the findings of fact and conclusions of law set forth above without reliance upon the testimony of Petitioner's mother, the Court does not weigh the credibility of that testimony or address the Government's concerns about that testimony. (Docket Entry 87 at 42.)

18

reinstatement of her appellate rights, Petitioner's motion (Docket Entry 63) should be **GRANTED** for the reasons set forth above, the judgment (Docket Entry 47) of the Court entered on March 6, 2018 should be **VACATED**, a new judgment should be re-entered to allow Petitioner an opportunity to file an appeal, and the existing appointment of counsel should extend to cover any consultation and appeal. Additionally, the prior recommendation of the Magistrate Judge (Docket Entry 77) should be adopted and all other grounds and sub-grounds set forth in Petitioner's motion (Docket Entry 63) should be **DENIED** for the reasons set forth in that recommendation.

_____
Joe L. Webster
United States Magistrate Judge

October 13, 2020
Durham, North Carolina